# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| JOHN FRANKFURT,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | No. 18-CV-0079-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff John Frankfurt seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Frankfurt argues that the administrative law judge (ALJ), John E. Sandbothe, erred in determining his residual functional capacity (RFC). Specifically, Frankfurt argues that the ALJ did not give good reasons for failing to fully credit his subjective complaints and the medical opinions from his treating neurologist and psychiatrist and that substantial evidence does not support the ALJ's failure to include several limitations in his RFC. I recommend **affirming** the ALJ's decision.

## I. BACKGROUND[1]

Frankfurt has suffered from migraines since the age of 10, but he testified that

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 14).

they have progressively worsened with time. AR 23, 74.[2] He also suffers from depression and a gambling addiction. AR 23, 79, 84.

Frankfurt graduated from high school in 1999 and worked full-time for eleven years at Wal-Mart as the manager of the toy department. AR 54, 307-08. He quit in March 2010 and has not worked since. AR 54, 307. He testified that he quit because of worsening migraines, as well as trouble getting along with supervisors, but the ALJ found that he quit because he felt he was not being treated or paid fairly (which is supported by substantial evidence, despite Frankfurt's argument otherwise). AR 26, 54-55, 57-58; *see* AR 111 (prior ALJ decision noted that although Frankfurt testified that he stopped working at Wal-Mart because of worsening migraines in late 2009 and early 2010, treatment records—which are not in the current administrative record—reflected that he did not seek "any treatment for worsening headache symptoms" during that time period and that he told a "therapist that he quit his job at Wal-Mart because he felt he was not being treated or paid fairly"); AR 369 (Frankfurt's friend and former coworker stated in third-party letter to Social Security Administration that Frankfurt quit job at Wal-Mart because "[t]hey changed the way that they did things" and he had "trouble adjusting to what management wanted," although he also stated that Frankfurt's migraines and depression worsened in 2010 and that Frankfurt called in sick to work several times due to migraines); AR 411 (Frankfurt told emergency room (ER) providers in March 2014 that he lost job at Wal-Mart due to migraines); AR 577 (Frankfurt told neurologist in December 2014 that "[b]y 2008-2009 he had so much nausea and [headaches] every day that he was suicidal[ and] . . . ended up having to quit his job and became very depressed"); AR 600 (Frankfurt's therapist stated in June 2015 letter to Social Security Administration that when she "began seeing him in 2008, he was barely able to maintain his job at Wal-Mart"; that he "reported migraines several times a week and . . .

---

[2] "AR" refers to the administrative record below.

persecutory delusions related to his supervisors and customers"; that he quit his job at Wal-Mart in 2008; and that "therapy sessions between 2010 and 2012 focused on his gambling addiction but also on him finding another job," and although "[h]e made a few inquiries about employment," he "never followed through on applying"); AR 646 (Frankfurt told psychiatrist in April 2015 that he quit working at Wal-Mart because "he was having more gambling problems and increased depression"); AR 773-97 (Frankfurt's Botox treatment records from 2015 to 2017 reflect he quit "because of headaches and depression"); AR 814 (Frankfurt told ER providers in May 2016 that he "lost" job at Wal-Mart "due to recurrent migraines, which caused excessive absenteeism").

At the time Frankfurt quit his job, he lived with his long-time girlfriend, and she and his family supported him during his unemployment. AR 79, 600, 660, 666, 685-86, 704, 706-07, 712, 727, 812, 814. Frankfurt's gambling addiction caused strife with his family and his girlfriend: Frankfurt estimated that since 2003, he has lost more than $900,000 gambling, "absorb[ing] his mother's finances and family fortune," but he continued to expect his girlfriend and family to give him money and became upset when they did not (leading providers to diagnose him with antisocial personality disorder). AR 411, 416, 418, 449, 454, 456-57, 491, 600-01, 645, 683-84, 773, 812, 814. He and his girlfriend broke up for good in August 2015, and he moved out, first into a hotel and then into an apartment paid for by his family. AR 660, 666, 712. His gambling lessened due to lack of funds, and he executed a self-exclusion ban from casinos sometime in 2016 to prevent himself from gambling. AR 79, 673-74, 687, 704, 706-07, 710, 712,

Frankfurt filed prior applications for disability benefits in January 2012, which an ALJ denied on September 20, 2013, after a hearing. AR 98, 114. When the Appeals Council denied review in February 2015, Frankfurt protectively filed the current applications for DI and SSI benefits, alleging disability beginning in 2010 (as he had in his prior applications). AR 98, 119, 127. The Social Security Administration denied those applications initially in April 2015 and upon reconsideration in September 2015. AR 127-85. In connection with those reviews, state agency psychological consultants

3

Russell Lark, PhD, and Lon Olsen, PhD, reviewed Frankfurt's file and issued opinions evaluating his mental RFC (AR 134-36, 163-66), and state agency medical consultants Chrystalla Daly, DO, and Jan Hunter, DO, issued opinions evaluating his physical RFC (AR 132-34, 161-62).

Frankfurt requested review by an ALJ. The ALJ held a video hearing on June 27, 2017, at which Frankfurt and a VE testified. AR 20, 70-71. On August 29, 2017, the ALJ issued a written opinion following the familiar five-step process outlined in the regulations[3] to find Frankfurt was not disabled. AR 20-33. The ALJ found that res judicata barred reconsideration of the prior ALJ decision and accordingly, determined the relevant time period began September 21, 2013, the day after Frankfurt's prior applications were denied. AR 20. The ALJ determined that Frankfurt suffered from several severe impairments, including depression, anxiety, antisocial personality disorder, migraines, and gambling addiction. AR 23. To evaluate whether Frankfurt's impairments prevented him from performing his past or other work (at steps four and five), the ALJ determined Frankfurt's RFC[4]:

> [Frankfurt] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Frankfurt] can occasionally climb, balance, stoop, kneel, crouch, and crawl. He should have no exposure to hazards and no exposure to extreme noise. He can

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[4] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

perform simple, routine work with no contact with the public, and no fast rate pace requirement.

AR 24-25. In determining Frankfurt's RFC, the ALJ considered the medical opinions from the state agency consultants, assigning them substantial weight, as well as medical opinions from Frankfurt's treating neurologist and treating psychiatrist, which the ALJ assigned little weight. AR 28-29, 31, 653-56, 669-72. Based on his determination of Frankfurt's RFC, as well as his age, education, and work experience, the ALJ found that a significant number of jobs existed that Frankfurt could perform, including kitchen helper, laundry worker, and cleaner/housekeeper. AR 32. Therefore, the ALJ concluded that Frankfurt was not disabled. AR 32-33.

The Appeals Council denied Frankfurt's request for review on May 29, 2018 (AR 1-4), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. §§ 404.981, 416.1481**. Frankfurt filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs. 1, 4). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 15, 18, 21), and the Honorable Leonard T. Strand, Chief Judge of the United States District Court for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Kirby***, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of

5

Case 1:18-cv-00079-LTS-KEM   Document 23   Filed 09/05/19   Page 5 of 20

those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Frankfurt challenges the ALJ's RFC determination. Frankfurt argues that the ALJ did not give good reasons for discounting his subjective complaints. Frankfurt also argues that the ALJ erred in assigning greater weight to the medical opinions of the nonexamining state agency consultants than to the medical opinions submitted by his treating neurologist and psychiatrist. Frankfurt argues that these errors resulted in an RFC that is not supported by substantial evidence and that specifically, the ALJ erred by failing to include limitations in his RFC reflecting Frankfurt's extreme limitations in maintaining attention and concentration; inability to work on a regular, sustained basis for 20% of the workday; marked limitations in performing within a schedule, maintaining attendance, and being punctual; and absences from work four or more times a month. Frankfurt's last argument depends on the success of his first two arguments, so I will not address it in a separate section, but I will discuss the evidence related to his ability to pay attention and to the frequency he suffers disabling migraines that would cause him to miss work in the section on subjective complaints.

### A. Subjective Complaints

When evaluating the weight to assign a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476

6

U.S. 1167 (1986), *reinstated*,[5] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." ***Black***, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary," ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)). "The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." ***Tucker v. Barnhart***, 363 F.3d 781, 783 (8th Cir. 2004).

The ALJ did not credit Frankfurt's subjective complaints, finding "discrepancies in information reported by the claimant to various treating sources" eroded his credibility. AR 30. As the ALJ recognized, Frankfurt testified at the hearing in June 2017 that he "always feel[s] like somebody's following [him] or there's somebody that's watching [him]." AR 26, 76; *see also* AR 337, 340 (reported in March 2015 function report that when in public, he always feels like someone is behind him, and he constantly looks around). The ALJ also noted that in the migraine calendar Frankfurt submitted as evidence to the Social Security Administration, in which he purportedly recorded the symptoms he suffered each day for a month in early 2017, Frankfurt reported feeling as if someone was following him one day, as well as seeing "crazy things" when he closed his eyes during a migraine, such as a giraffe. AR 30, 392, 394. The ALJ found these

---

[5] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

7

symptoms inconsistent with the medical records, finding that "[s]erial mental status examinations with his therapist [were] . . . continually absent of psychotic symptoms," and "[t]here was never mention of feeling like someone was following/watching him." AR 30. As the ALJ noted, the treatment records from Frankfurt's psychologist, Dr. Christine Rogers Cork, consistently reflected no evidence of psychotic symptoms on objective examination, as do the treatment records from all of Frankfurt's providers except one. *See* AR 421, 436, 449, 455, 457, 473, 485, 606, 660 , 666, 676, 680, 684, 686, 688, 690, 692-93, 698, 700, 702, 704, 708, 711, 713.

The only treatment records that reflect that Frankfurt occasionally demonstrated paranoid symptoms are those of Frankfurt's psychiatrist, Dr. Kija Weldon, who Frankfurt began seeing in April 2015, a few months after the Appeals Council affirmed the denial of his prior disability application. At his first appointment with Dr. Weldon, Frankfurt reported suffering hypervigilance and some paranoia, and Dr. Weldon prescribed Seroquel (which was prescribed to help him sleep as well as to treat his anxiety and depression generally). AR 605, 642-44, 648, 662. Frankfurt continued to report symptoms reflecting hypervigilance and paranoia at appointments with Dr. Weldon in May and June 2015. AR 642-43. During a hospitalization in June 2015, Frankfurt reported taking Seroquel "because he gets so 'worried' that 'people are following [him,] . . . think[s] that everyone is watching [him,] . . . think[s] the cops are going to come after [him, and] . . . know[s] that people follow [him]." AR 605. At appointments with Dr. Weldon through October 2015, Dr. Weldon twice noted no symptoms of paranoia, and other times noted that Frankfurt's paranoia had decreased or at least had not increased, and she continued to adjust his medications. AR 640-41, 661-62, 667-68. Dr. Weldon did not note any psychotic symptoms, including paranoia, on objective examination from November 2015 through late January 2016. AR 705-06, 709-10; *see also* AR 707 (in mid-December 2015, Frankfurt reported his paranoia was "about the same"). Dr. Weldon noted paranoia in March 2016 but not in April 2016, although she noted in April 2016 that Frankfurt reported feeling anxious about police. AR 701, 703.

8

From May to September 2016, Dr. Weldon's treatment records show Frankfurt did not report symptoms of paranoia. AR 689, 691, 694-97, 699. In October and November 2016, Dr. Weldon noted symptoms of paranoia on objective examination (but also noted at the November appointment that Frankfurt had been off his medications for three days). AR 683, 685, 687. Frankfurt started a new medication, and he reported seeing a figure in his oven door in December 2016. AR 681-82. Later in December 2016, Frankfurt reported his paranoia was the same, although he denied having any more hallucinations. At his next appointment with Dr. Weldon in January 2017, she noted paranoia symptoms of hearing whispering. AR 678. From February to April 2017, Dr. Weldon noted no symptoms of paranoia. AR 673-75, 677. Although there is some support in the treatment records that Frankfurt complained about feeling people were watching him, substantial evidence supports the ALJ's conclusion that the treatment records are inconsistent with Frankfurt's testimony that he constantly felt this way. Moreover, only one treatment record reflects a report of a visual hallucination, and no treatment records reflect Frankfurt reported seeing spots when suffering a migraine, as Frankfurt reported in his migraine diary.

Frankfurt testified that he cannot sit still long enough to watch a full television show and that he has to get up and walk around after ten to fifteen minutes of sitting. AR 26, 81-82. But in function reports from March 2015, he reported that his hobbies included watching television, which he did "great"; that he could go to movies in theaters with a friend; and that he could finish what he started, such as a movie, two-thirds of the time. AR 317, 320, 332, 335-36; *see also* AR 59 (testified at hearing in connection with prior application in July 2013 that he enjoyed watching movies for fun). A treatment note from July 2014 reflected that he reported staying at home most of the time (which he shared with his then-girlfriend), spending "many hours a day" gambling online or watching television. AR 469. A treatment note from November 2016 reflected he did not have a television (he lived alone by that time), but he went to a local "eatery" to watch sports. AR 793. That same treatment note reflects he reported "spend[ing] most

9

of his time at the library where he can use the computers." AR 793. Other treatment notes also reflect that he went to the library, often more than once a week (as he testified (AR 82-83)). *See* AR 705 (January 2016: reported going to library daily); AR 697, 699, 703 (March, May, June 2016: reported going to library a few times a week); AR 681, 685 (October and December 2016 treatment records noted still attending library); AR 679 (late December 2016: "still going to library [one time a week]"); AR 677 (February 2017: still going to library); AR 675 (March 2017: reported going to library three times a week); *see also* 676, 698. I recognize that Frankfurt suffered from restless leg syndrome, and providers' treatment notes more often than not noted agitation, restlessness, or fidgeting, either on objective examination or based on Frankfurt's complaints. *Compare* 413, 422, 578, 640, 643-44, 646, 662, 667-68, 674-75, 677-78, 681, 683, 685, 687, 689, 691, 694-97, 699, 701, 703, 705, 706-07, 709, 712, 729, 793, *with* 413, 436, 444, 449, 455, 457, 467, 473, 485, 498. But substantial evidence supports the ALJ's determination that Frankfurt's restlessness did not result in an inability to sit for more than fifteen minutes, as he testified. *See **Goff v. Barnhart***, 421 F.3d 785, 792 (8th Cir. 2005) (ALJ can consider claimant's activities of daily living in evaluating subjective complaints).[6]

Although Frankfurt's perceived inability to work focused on his migraines, he reported in a March 2015 function report that his depression and thoughts of killing himself make work seem pointless. AR 331. Frankfurt challenges the ALJ's characterization of the mental-health treatment records, arguing that his multiple hospitalizations due to feeling suicidal and his providers' mental status examinations support that he is more limited than found by the ALJ. Doc. 15 at 11-12. Frankfurt was

---

[6] The ALJ did not specifically note in the written opinion that Frankfurt testified he could sit for only ten to fifteen minutes, instead noting that Frankfurt claimed "inability to . . . watch[] television for more than 2 hours without being restless." AR 26. The ALJ recognized that Frankfurt stated in his function reports that his activities of daily living included watching television and going to the movies (AR 26), and the ALJ seemed to credit those statements over Frankfurt's testimony (without explicitly saying he was doing so).

10

hospitalized due to suicidal ideation four times during the time period at issue: from March 12 to 15, 2014, after he told his girlfriend he was considering drinking antifreeze, and he presented to the ER because his girlfriend told him things would be different afterward if he did so, and he "wanted to prove her wrong" (AR 410-12, 488); from March 30 to April 1, 2014, after he locked himself in a bathroom and threatened to drink antifreeze (and possibly did so) when his girlfriend refused to loan him $500 to gamble—he told providers he "did not have any real intention to hurt himself" (AR 415-22); from June 26 to 29, 2015, after he contemplated blocking the tailpipe of his car to poison himself with carbon monoxide because his migraine pain was no longer bearable (AR 604-10, 632); and from May 16 to 23, 2016, when he told a friend that he was thinking about being run over by a train and told providers he had had a "rough weekend" with migraines but "nothing new," he had broken up with his girlfriend of ten years a few months prior, and he was estranged from his family after gambling away an inheritance from a wealthy uncle (AR 802-15). He also reported during his hospitalizations in March 2014 that he had twice previously put a knife to his chest and considered killing himself and that more than a year prior, he had put a potato in the tailpipe of his car, but his car would not start. AR 421, 488. He also told providers after the fact about an attempted suicide by carbon monoxide poisoning on New Year's Day 2015, but he did not go through with it after thinking about how it would affect his girlfriend and family. AR 435, 442, 645. The ALJ recognized each of Frankfurt's hospitalizations for being suicidal and what triggered those feelings (AR 28-30), and he did not "mischaracterize the evidence" (as Frankfurt argues (Doc. 15 at 12-13)) by noting the "stressors" leading to Frankfurt's May 2016 hospitalization included his ongoing gambling problems and recent break-up. AR 30, 811. The ALJ also noted that a therapist who treated Frankfurt before and during the relevant time period opined he is unusually resistant to being blocked from doing what he wants, yelling and throwing tantrums when his girlfriend refused to give in to his demands, and once, refusing to eat to the point that he lost a noticeable amount of weight because his girlfriend would not give him money to gamble.

11

AR 29, 601. The treatment records show that at least one of Frankfurt's suicidal hospitalizations was the result of Frankfurt trying to manipulate his girlfriend into giving him money, and the ALJ could consider this fact when evaluating Frankfurt's subjective complaints related to his mental health.

Frankfurt also argues that the ALJ mischaracterized providers' objective examinations of his mental health. Doc. 15 at 11-12. The ALJ noted that Dr. Weldon's examinations consistently showed "depressed mood, restricted affect, and fair insight and judgment, but are otherwise unremarkable." AR 29. Frankfurt argues that the ALJ ignored Dr. Weldon's findings of psychotic symptoms, fidgeting, anxious mood, and suicidal ideation. Doc. 15 at 11. I disagree. First, I have already discussed Dr. Weldon's findings related to paranoia and fidgeting, which do not support any greater RFC limitations than found by the ALJ. Second, although Frankfurt consistently reported feeling suicidal, that fact did not prevent Frankfurt from performing his activities of daily living, as noted by the ALJ, and at least one of his suicide attempts was "tied to his threats when not indulged by family with money for gambling." AR 29. The ALJ did not need to include greater limitations in Frankfurt's RFC based on his chronic suicidal ideation. As for anxiety, although the ALJ failed to note that many of Dr. Weldon's treatment notes reflect Frankfurt reported a depressed and anxious mood (as opposed to just a depressed mood), the ALJ recognized other treatment notes in which providers found Frankfurt anxious, and the ALJ found that Frankfurt suffered from anxiety and included limitations in his RFC related to anxiety. AR 23, 25, 30. By saying Dr. Weldon's objective examinations were otherwise unremarkable, the ALJ did not appear to be referring to Dr. Weldon's mood findings, but rather, her findings of alertness, normal orientation, clear and spontaneous speech (as well as slow speech a few times), linear and logical thought processes, and intact recent and remote memory, and her findings that Frankfurt was cooperative and calm. *See* AR 640-43, 646, 662, 667-69, 673-79, 681, 683, 685, 687, 689, 694-96, 701, 703, 705, 706-07, 709-10, 712 (also noting good eye contact and intact attention); *see also* AR 436, 448, 455, 457, 468, 473,

578-79, 584, 606, 660, 666, 690, 692-93, 698, 700, 702, 704, 708, 711, 713, 716, 719, 722, 726, 765 (objective examinations from other providers). Substantial evidence supports the ALJ's characterization of Dr. Weldon's objective examinations as "otherwise unremarkable."

Moreover, Dr. Weldon routinely noted on objective examination that Frankfurt was "casually dressed" and did not check the box indicating Frankfurt suffered poor hygiene (a few times, she noted he was unshaven, but she also sometimes explicitly noted he was unshaven but clean). AR 641, 661, 668, 673-75, 677-79, 685, 687, 689, 691, 694-95, 697, 699, 701, 703, 705, 707, 710, 712. In addition, she found Frankfurt was "appropriately groomed" or "well groomed" at several appointments (and once noted fair grooming). AR 640, 643, 646, 662, 667, 683, 696, 706, 709. Treatment records from other providers also reflect that Frankfurt was able to adequately care for his personal hygiene. AR 417, 423, 436, 444, 455, 457, 468, 485, 500, 606, 814; *see also* AR 601 (June 2015 letter from therapist noted Frankfurt is able to perform personal grooming). Frankfurt testified at the hearing in June 2017 that he does not "take a shower very often[,] . . . . at best once a week," but "there's been times where it's longer, like up to two weeks." AR 84; *see also* AR 317-18, 332 (March 2015 function report and third-party function report completed by girlfriend at the time; both note issues with motivation to care for personal hygiene). The ALJ did not specifically mention this testimony, but Dr. Weldon's objective examinations are inconsistent with Frankfurt's subjective complaints related to his ability to maintain his personal hygiene, as well the other treatment records that fail to reflect Frankfurt had poor hygiene.

In addition to Dr. Weldon consistently noting intact memory (and intact attention the one time she evaluated attention on objective examination), treatment records from other providers also do not support greater limitations in attention and concentration than found by the ALJ, despite Frankfurt reporting difficulty concentrating in his March 2015 function report and testifying at the hearing that he had difficulty concentrating in school. AR 73, 331, 336, 339; *see also* 321-22. Other providers found Frankfurt's attention and

concentration to be normal on objective examination, although one treatment note from Frankfurt's mid-March 2014 hospitalization reflects a memory test in which Frankfurt remembered only two out of three things after a minute (but found his attention span and concentration to be grossly intact). AR 493, 578, 606, 638, 765, 804, 814. Frankfurt denied problems with concentration or memory due to his migraines in August 2013, but after that, he consistently reported decreased concentration when asked during the review of systems. AR 413, 508, 578, 637, 640-42, 644, 667, 685, 696, 701, 707, 709-10, 712, 728. Treatment records do not reflect that he otherwise complained of difficulties with attention or concentration to providers or sought medications to help improve his attention or concentration. The treatment records and Frankfurt's activities of daily living do not support extreme limitations in maintaining attention and concentration when not suffering a migraine.

Finally, Frankfurt challenges the ALJ's failure to fully credit Frankfurt's statements regarding the frequency and intensity of his migraine headaches. The ALJ pointed to Frankfurt's inconsistent statements to providers regarding his headaches. AR 27. The ALJ noted Frankfurt told his Botox provider in mid-June 2015 that Botox improved his migraines, and he suffered only three headaches per week of a lesser intensity than before Botox, with four to five severe migraines a month (down from eight to nine severe migraines before Botox). AR 27, 592. But the ALJ noted Frankfurt contradicted this statement at the end of July 2015, when he told his migraine specialist, Dr. Marc Hines, that he suffered four migraines weekly and four to eight migraines a month rated ten out of ten on the pain scale. AR 28, 714. And when Frankfurt next met with a new Botox provider in mid-October 2015, he reported having "his usual good effect after his last Botox treatment" but noted his migraines had increased in the last few weeks since he was late in receiving his Botox injections. AR 772-73. The Botox provider noted in the history section that before Botox, Frankfurt had daily pain with severe exacerbations three to four times a week; but after Botox, he had "about three milder headaches a week with [four to five] of them progressing to migraine in one

14

month." AR 772. Substantial evidence supports the ALJ's conclusion that Frankfurt's report of four migraines weekly to Dr. Hines was inconsistent with the statements to his Botox providers that he suffered only three mild headaches a week and four to five migraines a month. His report to Dr. Hines of four to eight severe migraines a month also differed from his complaint to his Botox providers of four to five severe migraines a month. Contrary to Frankfurt's argument otherwise, the ALJ relied on Botox treatment notes from close in time to Frankfurt's statement to Dr. Hines.

I further note that although Frankfurt consistently sought treatment for and complained of suffering migraine headaches, not all of his migraine headaches would render him unable to work. He described the types of migraines he suffers in his March 2015 migraine questionnaire to the Social Security Administration, and he noted even when suffering a migraine rated at an eight out of ten on the pain scale, he could still manage to go to a doctor's appointment (although he noted he sometimes would not be able to drive due to the pain). AR 326-28. Here, the ALJ did not doubt that Frankfurt suffers migraines and headaches but found that Frankfurt exaggerated the frequency with which he suffers severe migraines and headaches that confine him to his bed and render him unable to concentrate or work. The ALJ also noted that Frankfurt managed to work for years with his migraines and headaches and that the treatment records reflect Frankfurt consistently mentioned his pursuit of disability benefits. Taking all of the factors given by the ALJ into consideration, substantial evidence supports the ALJ's decision not to fully credit Frankfurt's subjective complaints regarding his disabling migraines.

I recommend that the district court affirm the ALJ's evaluation of Frankfurt's subjective complaints.

### B. *Medical Opinions*

When determining a claimant's RFC, the ALJ considers "medical opinions . . . together with the rest of the relevant evidence." **20 C.F.R. §§ 404.1527(b), 416.927(b)**.

15

"The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)**. "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (alteration in original) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Id*. The ALJ considers the following factors to determine the weight to assign a medical opinion:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**). Frankfurt argues that the ALJ did not give a good reason for assigning greater weight to the medical opinions of the nonexamining state agency consultants than to the medical opinions of his treating neurologist, Dr. Hines, and his treating psychiatrist, Dr. Weldon.

Dr. Hines is a neurologist who specializes in treating migraine headaches. *See, e.g.*, 432, 686, 788. Frankfurt first met with Dr. Hines on December 30, 2014, and he saw him roughly every six months thereafter (but sometimes sooner and sometimes later). AR 577, 585, 714, 716, 720, 723, 726. Dr. Hines submitted a medical opinion dated October 6, 2016, in which he opined that Frankfurt suffers four to five headaches a week lasting twelve to seventy-two hours and that Frankfurt's headache frequency and severity preclude any competitive work schedule, as Frankfurt would have to take frequent,

16

unscheduled breaks and would miss work more than four times a month due to his migraines. AR 669-71.

The ALJ assigned Dr. Hines's opinion little weight, since it was based largely on Frankfurt's subjective complaints regarding the frequency and severity of his migraines. AR 28. When an ALJ "reasonably conclude[s] that [a claimant's] statements lack[] credibility, [the ALJ can] discount [a treating source's] opinion to the extent that it relied on [the claimant's] subjective complaints." *Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017). Here, as discussed in the preceding section, the ALJ discounted Frankfurt's subjective complaints regarding the frequency and severity of his migraines, as Frankfurt told his Botox providers that he suffered far fewer severe migraines than he reported to Dr. Hines during the same time period. Therefore, substantial evidence supports the ALJ's decision to assign Dr. Hines's opinion little weight.

The ALJ also assigned Dr. Weldon's medical opinion little weight. AR 29. Dr. Weldon became Frankfurt's treating psychiatrist in April 2015. AR 644. She completed her RFC assessment of Frankfurt in August 2015, during his seventh appointment with her. AR 640-44, 653, 656, 661-62. She continued to see Frankfurt on a regular basis, once or twice a month, throughout the relevant time period. AR 667-68, 673-75, 677-79, 681, 683, 685, 689, 691, 694-97, 699, 701, 703, 705-07, 709, 712. She also referred Frankfurt to psychotherapy with a psychologist in her office, Dr. Cork, who treated Frankfurt beginning on August 18, 2015, (shortly after Dr. Weldon completed her RFC form) and throughout the relevant time period. AR 660, 666, 676, 680, 682, 684, 686, 688, 690, 692-93, 698, 700, 702, 704, 708, 711, 713.

Dr. Weldon evaluated Frankfurt's limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation, concluding that many of his limitations in those categories were no more than mild. AR 654-56. She found, however, that he suffered extreme limitations in his ability to maintain attention and concentration for extended periods of time. AR 654. She also found that he suffered marked limitations in his ability "to perform activities within a schedule,

17

maintain regular attendance, and be punctual within customary tolerances," opining that his impairments would "substantially interfere with his . . . ability to work on a regular and sustained basis at least 20% of the time" and that he would miss work six to seven days a month. AR 654, 656. She explained:

> He has sever[e] depression that impairs his concentration, causes low energy, [and] likely adds to his irritability. He also has debilitating migraines that cause him to miss work [and] add to his depression.

AR 656.

The ALJ assigned Dr. Weldon's opinion little weight, relying in part on her somewhat "unremarkable" mental status examinations and the triggers for Frankfurt's hospitalizations for feeling suicidal (discussed in the preceding section). AR 29. The ALJ also noted that Dr. Weldon's opinions regarding the frequency with which Frankfurt would miss work appeared primarily based on his migraines, not his depression or anxiety, and the ALJ had already discredited Frankfurt's statements regarding the frequency and intensity of his migraines. *See* AR 28-29. The ALJ also mentioned Dr. Weldon's September 2015 treatment record, issued shortly after her RFC opinion, in which Frankfurt reported feeling better since acquiring more resources and having his brother in town to help him find an apartment (Dr. Weldon still concluded Frankfurt suffered from significant depression and anxiety in the context of significant social stressors). AR 29, 667. I agree with Frankfurt that the ALJ improperly characterized this note as "the claimant's most recent appointment following" Dr. Weldon's RFC determination (AR 29)—Dr. Weldon's medical opinion is dated August 7, 2015, (AR 656) and Frankfurt saw Dr. Weldon on August 27, 2015 (AR 668)—and I also agree that the ALJ cannot discount a treating-source opinion based on an inconsistency with a single treatment record. Here, however, it is clear through the ALJ's RFC discussion that the ALJ considered all of Dr. Weldon's treatment records and the record as a whole. The ALJ gave good reasons for assigning little weight to Dr. Weldon's opinion regarding Frankfurt's ability to pay attention for extended periods and the frequency with which his

18

migraines would cause him to miss work (which is supported by the ALJ's overall discussion of Frankfurt's RFC).

Because the ALJ gave good reasons for discounting Frankfurt's treating-source opinions, the ALJ could properly assign more weight to the opinions of the state agency consultants. *See* **Hacker v. Barnhart**, 459 F.3d 934, 939 (8th Cir. 2006); *see also* **Kohn v. Colvin**, No. C13-4003-MWB, 2013 WL 5375415, at *13 n.5 (N.D. Iowa Sept. 26, 2013) ("Because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision." (quoting **Chandler v. Comm'r of Soc. Sec.**, 667 F.3d 356, 361 (3d Cir. 2011)), *report and recommendation adopted by* 2013 WL 6858433 (N.D. Iowa Dec. 30, 2013). Accordingly, I recommend that the district court affirm the ALJ's evaluation of the medical opinions.

### III. CONCLUSION

Substantial evidence supports the ALJ's decision to discount Frankfurt's subjective complaints and the opinions of his treating psychiatrist and neurologist. Substantial evidence also supports the ALJ's conclusion that Frankfurt did not suffer extreme limitations in maintaining attention and concentration and that his migraines would not cause him to miss work as frequently as he testified and as his treating sources believed. I recommend that the district court **affirm** the decision of the Social Security Administration and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and

Recommendation, as well as the right to appeal from the findings of fact contained therein. *See **United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 5th day of September, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa